IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| BELINDA JONES | § | PLAINTIFF |
| | § | |
| | § | |
| v. | § | Civil No. 1:17cv342-HSO-JCG |
| | § | |
| | § | |
| CRACKER BARREL OLD COUNTRY | § | |
| STORE, INC. | § | DEFENDANT |

MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION [36] FOR SUMMARY JUDGMENT
AND DISMISSING PLAINTIFF'S CLAIMS

BEFORE THE COURT is Defendant Cracker Barrel Old Country Store, Inc.'s Motion [36] for Summary Judgment. Plaintiff Belinda Jones alleges that Defendant discriminated against her based on her age and due to her association with a person who has a disability, namely her husband, when it terminated her employment. After due consideration of the record, Defendant's Motion, and relevant legal authority, the Court is of the opinion that Defendant Cracker Barrel Old Country Store, Inc. is entitled to judgment as a matter of law. Defendant's Motion [36] for Summary Judgment should be granted.

## I. BACKGROUND

A.    Factual background

1.    Jones' employment as Retail Manager

Plaintiff Belinda Jones ("Jones" or "Plaintiff") began her employment with

1

Cracker Barrel Old Country Store, Inc. ("Cracker Barrel" or "Defendant") in 1995. Compl. [1] at 2. Cracker Barrel terminated Jones' employment in February 2016. Construing all facts in Jones' favor, at the time of her termination she was employed as a Retail Manager at Cracker Barrel's Gulfport, Mississippi, store. Jones' Dep. [37-1] at 18-19. Jones was 50 years old. Monica Rivera's Dep. [37-2] at 174; *see also* Compl. [1] at 5. Jones' husband was undergoing cancer treatment, the cost of which she alleges factored into Cracker Barrel's decision to terminate her.

According to Plaintiff, each Cracker Barrel store has a restaurant side and a retail side. Jones' Dep. [37-1] at 19. In her position as Retail Manager, Jones managed the retail side of the Gulfport store, *id.*, and reported directly to the Retail District Manager, *id.* at 21-22. Jones' responsibilities included training retail employees on Cracker Barrel policies. *Id.* at 33. In performing this task, Jones would work in conjunction with a high-performing retail employee to train the rest of the retail staff. *Id.* at 33-34.

2.    Cracker Barrel handbook and employee discount policy

Cracker Barrel had an employee handbook, a copy of which Jones acknowledged she received when she began her employment. Jones' Dep. [37-1] at 36. Jones understood that she was required to comply with the handbook guidelines and policies. *Id.* Jones was asked at her deposition about Cracker Barrel's employee purchase discount policy, and she testified that she was familiar with the policy. *See id.* at 109-12. Jones' job responsibilities included monitoring her subordinates' use of Cracker Barrel's employee purchase discount policy, and

she was also responsible for ensuring that employees followed the policy.  *Id.* at 101-

02.

The handbook provided the following with respect to the employee purchase

discount policy:

> Employee Purchase Discount Policy
> The employee discount policy is intended as a benefit for Cracker Barrel employees.  The discount extends to family members and friends of the employee when accompanying the employee during a dining or shopping experience.  This policy is not intended to be used or construed as a sales building tool to the general public.  Using the employee discount in such a manner constitutes abuse and carries consequences that may include loss of discount privileges, disciplinary action, or termination of employment.  As the beneficiary of this discount privilege, it is your responsibility to protect the intent and integrity of the policy through appropriate use . . . .
> .  .  .
> MANAGER DISCOUNTS
> Managers will receive a 35% generic discount card during MIT training to utilize with restaurant or retail purchases.  Managers cannot allow any other employee use of their discount.  A discount card is not necessary at the time of the purchase.  Managers may provide their employee number along with a picture ID to receive a discount.
>
> STIPULATIONS
> .  .  .
> • On-duty managers may sign for their family member's meal or retail purchases as long as the manager uses the discount in person (the manager does not have to pay for the transaction).  It is not permissible for a manager to "loan out" his/her discount or let anyone else sign for the purchase.  The restaurant ticket, merchandise, and discount must be presented and paid for at the time of purchase.
> • The employee must be present during the transaction, must request his/her discount, and must sign the check.  The employee does not have to pay for the transaction.
> • Managers and cashiers cannot ring their own transaction using their own discount.
> .  .  .
> • Employees who engage in improper use or abuse of the discount will be disciplined up to and including termination.
> .  .  .

- No more than eight people, including the employee/manager may be covered by the discount program in one visit.

Handbook [37-1] at 118-19.

Cracker Barrel also had in place an asset protection policy, which provided that "[f]ailure to comply with these policies will result in disciplinary action, up to and including termination of employment." Policy [37-1] at 152. With respect to discounts, the asset protection policy stated in relevant part that

> [i]t is a violation of company policy to handle discount purchases for employees other than as defined by Cracker Barrel policy . . . . Employee must sign for purchases. Employees must present their individual Discount I.D. Cards or show positive identification. Employees are not to allow other employees and/or guests to use their discount cards, or employee I.D. number . . . . Employees are expected to fully comprehend the details of the policy. Violations will be considered intentional.

Policy [37-1] at 153.

3.    Employee Appreciation Days

Cracker Barrel allowed for a three-day period once a year, usually in late November or early December, known as Employee Appreciation Days (sometimes referred to as "EAD"), during which employees would receive an additional 10% discount above their normal employee discounts for purchases of both food and merchandise. Jones' Dep. [37-1] at 98-100. According to Jones, Cracker Barrel encouraged employees to invite friends and family to visit the store during these days, and like at other times throughout the year, employees were authorized to extend their employee discount to friends and family. *Id.* at 100. Cracker Barrel's employee discount policy remained in force during the Employee Appreciation Days.

4

*Id.* at 100-01.

According to Jones, when a friend or family member of hers would come into the store to shop during busy Employee Appreciation Days, she would inform the cashier who the person was and say "she's with me" in order for the cashier to know the person was Jones' guest. *Id.* at 114. Periodically, Jones would return to the cash register, sign the tickets, and ask to which guest each ticket related. *Id.*

Jones' Retail District Manager at the time of her termination was Monica Rivera ("Rivera").[1] Rivera Dep. [37-2] at 213. Rivera testified that during the Employee Appreciation Days relevant to this case, excessive purchases were made using Jones' employee discount. *Id.* Specifically, on December 1, 2015, Jones' discount was used for 92 separate transactions, and on December 3, 2015, it was used for 62 transactions. *Id.*

4.    Jones' husband's cancer diagnosis and treatment

In January 2009, Jones' husband was diagnosed with Stage IV metastatic prostate cancer. Jones' Dep. [37-1] at 46. Jones testified that she reported the diagnosis to her District Manager, who at the time was Mary Ellen Johnson ("Johnson"). *Id.* at 46-47. According to Jones, Johnson was "very sympathetic, very supportive," *id.* at 47, and it was "[v]ery easy" to work her husband's appointments around her schedule at Cracker Barrel, as he was being treated with hormonal medication, *id.* at 48. There was one instance where Jones had to delay a trip to Jackson, Mississippi, to meet Johnson due to her husband's condition, and Johnson

---

[1] Rivera's legal name is now Monica Rivera Arce. *See* Rivera Dep. [43-4] at 2.

5

was "fine with it." *Id.* at 50. Johnson did not discipline Jones or give her a difficult time after this incident occurred. *Id.*

Jones related that, at the time Rivera became her new Retail District Manager in August 2014, "it was getting difficult for [Jones' husband] to respond to treatment," and Jones informed Rivera of her husband's diagnosis. *Id.* at 49. According to Jones, Rivera's initial reaction was "sympathetic and supportive." *Id.* At her deposition, Jones did not recall any issues or problems with Rivera with respect to Jones' work schedule. *Id.*

5.    Issues at the Gulfport store in 2015 and 2016

In August 2015, which was the beginning of the 2016 fiscal year, Cracker Barrel designated Jones' Gulfport store as a "Focus 50" store. Focus 50 stores were those that ranked in the top 50 stores across the entire company in terms of total dollars in missing retail inventory from the previous fiscal year, in this case fiscal year 2015. Jones' Dep. [37-1] 52-54. This difference between book inventory and actual inventory numbers was known as "shrink results" and was based on a variety of factors. *Id.* When the Gulfport store became a Focus 50 store, Jones discussed how to improve the shrink results number with Rivera. *Id.* at 57.

On August 31, 2015, the Gulfport store received a 69.31 percent score on a separate loss prevention audit. *See* Jones' Dep. [37-1] at 58. According to Jones, anything below 85 percent is considered failing. *Id.* at 58-59. Jones testified that Gulfport's score was "not acceptable" and that this rating was an embarrassment for the store. *Id.* at 66. Rivera played no role in the loss prevention audit. *Id.*

6

After the audit, Jones was responsible for putting together an Audit Action Plan report, or a written plan of action, to respond and improve the store. *Id.* at 72-74. Jones was required to submit the plan within 24 hours and failed to do so because she was on vacation at the time. *Id.* at 73, 75. Upon Jones' return from vacation, Rivera asked her to submit the report "ASAP." *Id.* at 75. Jones did not do so within the time allotted, and consequently she received a write-up from Rivera on September 29, 2015. *Id.* at 73-74, 78; *see also* Report [37-1] at 128.[2]

As a consequence of the audit and the Gulfport store becoming a Focus 50 store, Rivera determined that managers who were joining the company would no longer be sent to the Gulfport store for training. Jones' Dep. [37-1] at 80-81; *see also* Report [37-1] at 129. Jones testified that she did not disagree with Rivera's decision because "I needed to focus on improving." Jones' Dep. [37-1] at 81.

On or about November 2, 2015, Jones received an annual evaluation from Rivera based upon her performance from the prior year. *Id.* at 91-92. Jones received a score of 3.00, which fell roughly in the middle of a scale that went from 0.0000 to 5.0000. Jones' Dep. [37-1] at 98; Evaluation [37-1] at 130-39.

6.    Investigation of Jones' use of the employee discount

On January 17, 2016, Rivera conducted a routine annual Retail District Manager's audit for the Gulfport store. Rivera's Dep. [37-2] at 61, 65. Rivera did

---

[2] Jones also received a verbal reprimand on September 28, 2015, related to monies that were entrusted to her the year before following a silent auction for Cracker Barrel Cares. *See* Report [37-1] at 127. According to Jones, she did not forward the money to the home office as a result of her own oversight. *Id.* Rivera's Report stated that Jones' actions were in violation of rule of conduct 28: "Be honest in handling money, merchandise, or other property which belongs to the company, other employees, or guests." *Id.*

not have access to the employee discount information, so the employee discount was not part of this audit. *Id.* at 65. By coincidence, at the same time the Restaurant District Manager, Eric Johnson, was performing his own twice-a-year audit. *Id.* at 65-66. According to Rivera, the Restaurant District Manager's audit did include a section where he or she must review employee discount usage in a form called "Exception Reporting." *Id.* at 66.

While Rivera was performing her audit, Johnson "called [her] over to the restaurant manager office" and "asked [her] to look at reports that he was looking at with him of what he found." *Id.* at 66-67. Rivera testified that for the month of January, "Jones' employee number was used every single day she worked, and the only two days a week that were not used was for her days off," *id.* at 67, and that each day "appeared to [them] as high amounts of discount," *id.* at 70-71. According to Rivera, "[t]he frequency and the amounts was [sic] what jumped out at [Johnson], and that's why he called [her] over." *Id.* at 71. Because Rivera and Johnson believed that the frequency and amount of the discounts were excessive, they jointly decided to send an e-mail informing the company's Loss Prevention Department of their discovery. *Id.* at 71-73.

Rivera e-mailed Jim Bishop ("Bishop") in Cracker Barrel's Loss Prevention Department on January 17, 2016; Bishop responded to Rivera's e-mail and called her on January 27, 2016. *Id.* at 104-06. According to Rivera, following an investigation Bishop determined that Jones had abused the employee discount in terms of both frequency and quantity. Rivera's Dep. [37-2] at 118; *see also* Bishop

8

Jan. 27, 2016, E-Mail [37-4] at 37 (e-mail to Rivera, Don Vanek, and Beth Quinn listing Bishop's findings regarding Jones' discount usage).

Rivera immediately discussed the matter with her supervisor, Retail Regional Vice-President Beth Quinn ("Quinn").[3]  Rivera's Dep. [37-2] at 125.  Rivera and Quinn then called Don Vanek ("Vanek"), who was the field human resources manager.  *Id.* at 125, 179; Bishop's Dep. [37-4] at 50.  The three decided that Bishop should interview Jones to hear her side of the story.  Rivera's Dep. [37-2] at 125. After the conversation between Rivera, Quinn, and Vanek, Vanek wrote Rivera and Quinn an e-mail describing a conversation he subsequently had with Bishop:

> I called and spoke with Jim [Bishop] after our call and he is going to burn some video of [Jones] completing transactions with her employee discount number on multiple occasions to show how she was using it. Also he is pulling data from last year to compare with what she has done this year.  That will show the amount of difference she has used her discount from LY to TY.  This should strengthen the case against her.

E-Mail [43-6] at 1.

On or about February 1, 2016, Bishop came to the Gulfport store to discuss Jones' use of the employee purchase discount policy with her.  Jones' Dep. [37-1] at 102-03.  Bishop informed Jones that in the past three months, her employee discounts totaled more than $12,000.00.  *Id.* at 104-05.  Bishop asked Jones if all of the discounts for her friends and family during the Employee Appreciation Days were actually used for her friends and family, and she responded in the affirmative, stating that "they absolutely were."  *Id.* at 106.

Jones admitted to Bishop that there were instances in which transactions

---

[3] Quinn's name is now Beth Hatfield.  *See* Quinn's Decl. [37-3] at 2.

had occurred while Jones was not physically present at the cashier's stand.  *Id.* at 116.  Jones contends that her understanding of Cracker Barrel's policy was that as long as a manager was at work, meaning physically located inside the restaurant, the manager was in compliance with the employee purchase discount policy's requirement to be physically present for the transaction.  *See, e.g.,* Jones' Letter [37-5] at 24 ("I thought if you were in the building that was considered 'present.'"); Bishop's Dep. [43-5] at 67 (testifying that Jones "stated, using her interpretation of the policy, that she was present by being in the store").

Jones denied to Bishop that she would call into the store to see if sales goals had been met and that, if not, she would drive back to the store to purchase items for the purpose of hitting sales goals for the day.  Jones' Dep. [37-1] at 127-28.  Jones admitted under oath in her deposition, however, that she would leave a credit or debit card with a cashier when there was a line of customers in order for the cashier to complete transactions for Jones when the cashier had time.  *Id.* at 129.

Jones further acknowledged that the procedure set forth in the employee purchase discount policy for a cashier conducting a transaction involving an employee discount required the cashier to place the receipt signed by the employee utilizing the discount in the cash drawer before the cashier collected payment for the merchandise.  *Id.* at 116-18, 121.  Jones exhibited her familiarity with this step-by-step process as counsel reviewed it with her during her deposition.  Jones agreed that it was clear that the Cracker Barrel policy required the employee whose discount was being used to sign the receipt prior to the cashier collecting payment.

10

116-18, 121-22.  When Jones would sign the tickets at a later time, she was not complying with this step-by-step process.  *See id.*

Bishop inquired about Jones extending her discount to two guests, Dorothy Saad ("Saad") and Kathy Drago ("Drago"), who appeared to be making large, bulk retail purchases at Cracker Barrel.  *Id.* at 131.  At her deposition, Jones denied knowledge that these guests were reselling items they purchased using her employee discount.  *Id.* at 136-38, 140.[4]

7.    Jones' termination

On February 2 or 3, 2016, Rivera, Vanek, and Quinn met to make a final decision regarding Jones.  Rivera's Dep. [37-2] at 142-43.  According to Rivera, based upon their findings from the investigation, she, Vanek, and Quinn determined that Jones' usage of her discount was excessive, and they made the joint decision to terminate her employment.  *Id.* at 146, 210.  Rivera testified that their decision was based upon the number of times the discount was used and the amounts involved, Jones' knowledge of extending the discount for purchases for resale, and her extending access to her discount to the public by allowing more than eight people per visit to use her discount.  *Id.* at 143; *see also* Quinn's Decl. [37-3] at 2-4.  Quinn's supervisor, Vice President of Retail Operations Kathy Hansen, signed

---

[4]  According to Bishop, Jones stated during his interview with her that Drago purchased retail items to include in gift baskets that she would resell.  *See* Bishop's Feb. 1, 2016, E-Mail [37-4] at 46 (e-mail to Rivera, Vanek, and Quinn regarding Bishop's meeting with Jones).  This indicates Jones' knowledge of the resale of merchandise purchased with her employee discount.  However, the Court must construe the evidence in Jones' favor at the summary-judgment stage.

off on the decision to terminate Jones.  Quinn's Decl. [37-3] at 4.[5]

On February 5, 2016, Rivera terminated Jones.  *Id.*; Rivera's Dep. [37-2] at

143.  According to the Employee Counseling Report, the Loss Prevention

Department determined through its investigation that Jones

> (1) used the discount as a sales building tool on days she was missing her sales goals; (2) extended discounts to the general public on EAD days, exceeding the 8 people per visit; [and] (3) extended discounts on bulk purchases to a guest, knowing they were for resale.

Report [37-1] at 151.  Rivera indicated that Jones' use of the employee discount in

this manner violated Employee Purchase Discount Policy and Cracker Barrel's

Asset Protection Policy, and she stated that Jones' "employment will be separated

effective immediately."  *Id.*  Jones responded in the employee statement that "I

don't agree w/ this decision."  *Id.*

8.    Jones' belief as to why she was terminated

Jones now claims that she was terminated due to her age and her husband's

disability because of his ongoing cancer treatment.  Jones questions the truth of

Cracker Barrel's reasons for discharging her.  She claims that other managers and

employees would use the employee discount program in the same manner she did,

such as permitting Drago to use their employee purchase discounts and permitting

friends and family to purchase items using their discounts while the employee was

not physically present at the cashier's stand.  According to Jones, these other

employees were not terminated for their actions.  Jones' Dep. [37-1] at 176-97.

---

[5]  When an employee with over 15 years' experience with Cracker Barrel is terminated, a vice-president and the human resources department must approve the termination.  This occurred in Jones' case.  *See* Rivera's Dep. [37-2] at 123-24.

However, Jones testified that she had no idea whether Rivera or Bishop knew that any of these other employees were extending their discounts in these ways. *Id.* at 189, 195, 199-200.

In her deposition, Jones acknowledged that Rivera, Quinn, and Vanek never said anything she felt was inappropriate about her age or her husband's cancer. Jones' Dep. [37-1] at 158-59. According to Jones, during the time she was employed at Cracker Barrel, she never experienced any conduct or comments that she believed were inappropriate or that were directed toward her age or her husband's cancer. *Id.* at 159.

Jones acknowledged that she is not accusing any specific individual of discriminating against her because of her age or her husband's cancer. *Id.* at 160. When asked what evidence showed that she was terminated due to her age, Jones responded that, "I was replaced with someone younger, quite a bit younger, and . . . I was a tenured manager, and this person was a lot younger than me." *Id.* However, Jones could not point to any evidence showing that anyone at Cracker Barrel had a problem with the fact that Jones was "tenured." *Id.* at 162. Rivera testified that she knew her employees' birthdays and that Jones had just turned 50 before she was terminated, but Rivera, Quinn, and Vanek all maintain that Jones' age was not discussed or considered in the decision to terminate her. Rivera's Dep. [37-2] at 174, 208-09; *see also* Quinn's Decl. [37-3] at 4; Vanek's Decl. [37-5] at 3.

As for Jones' husband's cancer, Jones related a story about a conversation she had with Rivera on a business trip around January 2016. Jones' Dep. [37-1] at 162-

63.  Rivera was speaking of her own health and stomach issues she was experiencing, and asked Jones for advice.  *Id.*  Rivera made a comment about the expense of medical care and said, "I know it's expensive for your husband."  *Id.* at 163.  Jones responded, "oh, yeah, really expensive," and informed Rivera that the cost was around $100,000.00 per month for a new treatment he was receiving.  *Id.*  According to Jones, "I thought it was just a conversation, wellness check," because Jones had spoken to Rivera in the past about her husband's health.  *Id.* at 165.  Jones did not tell Rivera that Cracker Barrel was going to be paying for the cost of her husband's treatment, *id.* at 167, and Rivera did not say anything during the conversation that indicated to Jones that Rivera was concerned about the cost of the treatment, *id.* at 167-68.

Jones did not recall Rivera ever asking her again about her husband's treatment or its cost.  Jones' Dep. [37-1] at 168.  Rivera, Vanek, and Quinn have all testified they never mentioned or discussed Jones' husband's cancer diagnosis or treatments in the course of deciding to terminate Jones.  Rivera's Dep. [37-2] at 209; Quinn's Decl. [37-3] at 4; Vanek's Decl. [37-5] at 3.  After she was terminated, Jones remained on Cracker Barrel's insurance plan for 18 months under COBRA, which covered her husband's treatments.  Jones' Dep. [37-1] at 170.

9.  Jones' replacement

Rivera conducted interviews until May 2016 in order to fill Jones' vacant position.  Rivera's Dep. [37-2] at 195.  Rivera interviewed and eventually hired Jamie Ruiz ("Ruiz"), who was 32 years old.  *Id.* at 195-96.  Rivera has testified that

14

there are five retail managers who work in her district who are over 40 years old, and of those, she hired three of the five when they were already over 40. *Id.* at 207.

In 2017, Ruiz and 21 other retail managers were investigated for inflating conversion rates. *See* Ruiz Dep. [43-14] at 19. "Conversion is the number of guests that make a purchase versus the number of guests that dine in the restaurant," or conversion of restaurant business into retail sales. *Id.* at 20. Cracker Barrel's "goal is for every 100 guests that come in that 20 make a purchase in retail." *Id.*

According to Ruiz, she was ringing up multiple small items that she was purchasing separately, without using her employee discount, in order to make it appear as though customers were purchasing those items, to increase the conversion percentage at her store. *Id.* at 19-21. Rivera and Keith Clark ("Clark") from Loss Prevention visited the Gulfport store and inquired about this behavior, and Ruiz admitted what she had been doing and that she did it for a month before she ceased. *Id.* Following an investigation, Ruiz was required to pay back a bonus she had purportedly received due to these inflated numbers, and was given a final written warning and informed that "[i]f anything else were to happen in that category [she] would be terminated." *Id.* at 19-20. Rivera and Vanek then met with Ruiz and presented her with a final written warning and notification regarding her bonus. Vanek's Decl. [37-5] at 4.

Even though Rivera visited the Gulfport store to discuss the suspected inflation of the conversion rates with Ruiz, and Rivera and Vanek both visited the store to inform Ruiz of Cracker Barrel's ultimate disciplinary decision, the

competent summary judgment evidence shows that neither Rivera, Quinn, nor Vanek played any role in the 2017 Loss Prevention investigation into the manipulation of conversion rates by retail managers, including the investigation of Ruiz. *See* Quinn's Decl. [37-3] at 4; Vanek's Decl. [37-5] at 3-4. Nor did any of the three have any actual involvement in the decision to discipline Ruiz based upon the results of the investigation. *See* Quinn's Decl. [37-3] at 4; Vanek's Decl. [37-5] at 3-4. Even though Rivera and Vanek met with Ruiz and presented her with the final written warning and notification regarding her bonus, the investigation was handled by Loss Prevention, and the disciplinary decisions that followed were made by Cracker Barrel's corporate human relations leadership. *See* Quinn's Decl. [37-3] at 4; Vanek's Decl. [37-5] at 4.

        10.    Restaurant Manager DeeJae DelGaicco

        During Ruiz's deposition she referenced Restaurant Manager DeeJae DelGaicco ("DelGaicco"). *See* Ruiz's Dep. [37-6] at 27. According to Ruiz, while she was working at the Gulfport store, and after Jones' termination, DelGaicco was also extending her employee discount to Drago. *Id.* Ruiz testified that Drago "talk[ed] about how they were friends and they hung out outside of work." *Id.* One day Ruiz overheard Drago mention to an employee that she was purchasing ornaments to include in gift baskets she was going to sell. *Id.* Because this raised a "red flag" for Ruiz, she contacted Rivera to ask whether employees were allowed to extend their discount to persons reselling the product, and Rivera replied "no, absolutely not." *Id.* at 27-28.

Rivera asked for specifics, and Ruiz relayed what she had heard pertaining to Drago and DelGaicco's discount. *Id.* at 28. Rivera instructed Ruiz to inform DelGaicco immediately. *Id.* When Ruiz spoke to DelGaicco, DelGaicco indicated that she did not know that Drago was reselling the purchased products, and to Ruiz's knowledge, "[e]ver since then there has never been a purchase, a retail purchase with [DelGaicco's] discount to Kathy Drago since." *Id.*

B.    Procedural background

After Cracker Barrel terminated Jones in February 2016, she filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at 2. The EEOC subsequently provided Jones with a Notice of Right to Sue [1-2], and she timely filed this lawsuit. Jones alleges that Cracker Barrel unlawfully terminated her from employment because of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and because of her husband's disability and the rising cost of his ongoing cancer treatment, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* *Id.* at 5.

Cracker Barrel has now filed a Motion [36] for Summary Judgment asserting that there are no disputed issues of material fact and that it is entitled to judgment as a matter of law on Jones' claims. Cracker Barrel argues that even if Jones has made out a prima facie case of discrimination, she cannot show that its legitimate, nondiscriminatory reasons for her termination were a pretext for discrimination. Def.'s Mem. [42] at 14-21.

As for Jones' associational ADA claim, Cracker Barrel contends that the
United States Court of Appeals for Fifth Circuit has not explicitly recognized such a
cause of action. *See id.* at 21 n.15 (citing *Spencer v. FEI, Inc.*, 725 F. App'x 263, 267
(5th Cir. 2018)). Cracker Barrel posits that, even if such a claim is viable in the
Fifth Circuit, Jones cannot establish a prima facie case because "she can point to no
evidence linking her husband's cancer, or the cost of his treatment, to the decision
to terminate her." *Id.* at 22. Cracker Barrel further maintains that Jones cannot
establish that Cracker Barrel's legitimate, nondiscriminatory reasons for her
termination were mere pretext for associational disability discrimination. *Id.* at 24.

Jones responds that Cracker Barrel's purported reasons for terminating her
have changed since her termination on February 5, 2016, and that its "proffered
and shifting explanations are contrived and unworthy of credence." Pl.'s Mem. [44]
at 14. Jones argues that because Cracker Barrel has failed to rebut the
presumption of age discrimination with evidence of a legitimate, nondiscriminatory
reason for its employment decision, summary judgment is not appropriate, *id.*, and
that she has shown pretext based on disparate treatment, *id.* at 15-20. She
identifies Ruiz and DelGaicco as appropriate comparators. *Id.* Jones also contends
that she has made out a prima facie case of associational discrimination under the
ADA. *See id.* at 20-22.

## II.  DISCUSSION

### A.  Summary judgment standard

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted). If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In deciding whether summary judgment is appropriate, the Court views facts and inferences in the light most favorable to the nonmoving party. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 858 (5th Cir. 2010).

B.    Plaintiff's ADEA claim

    1.    The ADEA

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation terms, conditions, or privileges of employment, because of the individual's age." 29

U.S.C. § 623(a).  The Fifth Circuit has directed that where a plaintiff presents only circumstantial evidence of discriminatory animus, she must "negotiate the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*."  *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, a plaintiff establishes a prima facie case of age discrimination by showing that: "(1) [she] was discharged; (2) [she] was qualified for the position; (3) [she] was [at least 40 years old] at the time of discharge; and (4) [she] was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of [her] age."  *Machinchick*, 398 F.3d at 350 (citation and quotation marks omitted).

If a plaintiff makes a prima facie showing, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the employment decision.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The employer's burden is only "one of production, not persuasion: it 'can involve no credibility assessment.'"  *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

If an employer produces evidence of a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination created by the plaintiff's prima facie case disappears, and "the burden shifts back to the plaintiff to make an ultimate showing of intentional discrimination."  *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012).  "Under the ADEA, the employee must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant

were not its true reasons, but were a pretext for discrimination." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015) (quotation omitted).

    2.   <u>Jones' prima facie case and Cracker Barrel's legitimate, nondiscriminatory reasons for terminating Jones</u>

For purposes of this Motion [36], Cracker Barrel assumes that Jones can establish a prima facie case of age discrimination. Def.'s Mem. [42] at 14. The Court's analysis therefore begins with Cracker Barrel's burden of producing evidence that it had a legitimate, nondiscriminatory reason for terminating Jones.

Cracker Barrel claims it terminated Jones because of "her repeated and extensive violations of the employee discount and asset protection policies." Def.'s Mem. [42] at 15. Cracker Barrel has submitted competent evidence to support its position that, among other things, Jones: (1) repeatedly allowed cashiers to apply her employee discount to transactions that occurred while she was not present at the cashier's stand; (2) extended her discount to a guest she knew was making bulk purchases for resale; and (3) extended her employee discount on as many as 92 separate transactions in a single day. Cracker Barrel has met its burden of production of identifying legitimate, nondiscriminatory reasons for its decision. *See Goudeau*, 793 F.3d at 476. The burden thus shifts to Jones to show discriminatory intent. *Id.*

    3.   <u>Jones' evidence of pretext</u>

"At this step of the *McDonnell Douglas* analysis, an ADEA plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Goudeau*, 793 F.3d at 476. In determining

whether a plaintiff has proffered sufficient evidence of pretext to proceed to trial, courts "consider 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.'" *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000) (quoting *Reeves*, 530 U.S. at 148-49).  Here, Jones relies upon the falsity of Cracker Barrel's legitimate, nondiscriminatory reasons for terminating her and upon her disparate treatment in relation to two purported comparators. Pl.'s Mem. [44] 9-20.

> a.    Jones' argument that Cracker Barrel's reasons for termination are unworthy of credence

Jones argues generally that Cracker Barrel's reasons for terminating her were not its true reasons but were a pretext for age discrimination.  *See* Pl.'s Mem. [44] at 9-15. "[T]he issue at the pretext stage is whether [the employer's] reason, even if incorrect, was the real reason for [the plaintiff's] termination." *Goudeau*, 793 F.3d at 476 (quotation omitted).  Proof that a defendant's explanation is false and unworthy of credence is "one form of circumstantial evidence that is probative of intentional discrimination" and can be "quite persuasive." *Reeves*, 530 U.S. at 147.  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

Jones asserts that Cracker Barrel's proffered reasons for discharging her have varied over time and are therefore unworthy of credence.  *See* Pl.'s Mem. [44] at 9-15.  The Court's review of the record does not support Plaintiff's position that

Cracker Barrel's reasons for terminating her have changed. While Cracker Barrel has perhaps worded its justifications differently over time, the thrust and substance of Cracker Barrel's reasons have remained constant. Every indication in the record is that Jones was terminated for violating Cracker Barrel's employee purchase discount policy and its asset protection policy. Cracker Barrel has consistently asserted that Jones violated these policies based upon her specific actions, including her alleged excessive use of the employee discount, her failure to be present during transactions in which her discount was used, and her extension of the discount to guests making bulk purchases for resale. The record simply does not reveal any "vacillating reasons for termination." *Id.* at 9.[6]

Indeed, many of the underlying facts in this case are not disputed. Jones does not dispute that she was not physically present at the cashier's stand when her

_____

[6] Jones has submitted a copy of an undated document [43-10] from the Mississippi Department of Employment Security ("MDES") entitled "View Sides Correspondence," which appears to include a third-party claims administrator's responses to questions about the circumstances surrounding Jones' termination that MDES posed in the course of Jones' application for unemployment benefits. When asked to explain why Jones was no longer employed, the third-party claims administrator responded that she "was discharged due to a violation of company policy regarding asset protection policy. The final incident occurred when on 09/25/15 the claimant failed to hold on to donation money, and deliver the money to home office." Doc. [43-10] at 1. Plaintiff has not adequately explained how this third party's statement demonstrates any discriminatory animus by Cracker Barrel. Moreover, Jones supplied an audio recording [46] from an MDES telephonic hearing before an administrative law judge where Rivera appeared on Cracker Barrel's behalf. During the MDES hearing, Rivera stated that Jones was terminated because the Loss Prevention Department concluded from its investigation that Jones had misused her employee discount. Rivera provided specific examples of Jones' alleged misuse, including extending her discount to a guest who was suspected of reselling the purchased merchandise, permitting employees to use her discount and credit card to make transactions using her employee discount when she was not present, and utilizing her discount three to four times more than other retail managers, more than 300 times during the course of a two-and-a-half month period. Cracker Barrel's position at the MDES hearing was therefore consistent with the reasons it gave at the time of Jones' termination and throughout this litigation.

employee discount was used.  Nor does Jones dispute that she did not immediately sign tickets before customers using her employee discount tendered payment. Instead, Jones advances an interpretation of the employee purchase discount policy that differs from Cracker Barrel's.  Jones testified that she believed that a manager simply had to be present in the restaurant while his or her employee discount was used, and that she could sign accumulated tickets later.  This is at odds with the requirements set forth in Cracker Barrel's cashier procedures for employee discount transactions.

Every indication in the record is that the joint decisionmakers, Rivera, Quinn, and Vanek, relied upon Bishop's findings in good faith and terminated Jones for what they believed were violations of Cracker Barrel policies.  Even if Cracker Barrel were found to have wrongly interpreted its own policies, this does not demonstrate pretext for age discrimination.

> The ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions nor was it intended to transform the courts into personnel managers. The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.

*Moss v. BMC Software, Inc.*, 610 F.3d 917, 926 (5th Cir. 2010) (quotation omitted).

It is not the function of this Court to question whether the decision to terminate Jones was correct.  Rather, the question is whether any "rational factfinder could conclude that the action" was based on age discrimination.  *Reeves*, 530 U.S. at 148.  Based upon the record before it, the Court is not persuaded that Jones' arguments are sufficient to create a material question of fact regarding

24

whether Cracker Barrel's reasons for terminating her were false and therefore pretextual.

      b.    <u>Cracker Barrel's treatment of purported comparators</u>

Jones offers as evidence of Cracker Barrel's discriminatory animus her position that the company accorded preferential treatment to two younger comparators, namely Ruiz and DelGaicco. *See* Pl.'s Mem. [44] at 15-20. The Court is not persuaded that Ruiz and DelGaicco were sufficiently similarly situated to serve as comparators.

"In disparate treatment cases, the plaintiff-employee must show nearly identical circumstances for employees to be considered similarly situated." *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 353 (5th Cir. 2007) (quotation omitted). To rely on disparate-treatment evidence to rebut pretext, "a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001) (quotation and alternations omitted).

The Fifth Circuit has held that

[e]mployees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated. Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated. This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were

taken under nearly identical circumstances.  The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions.   If the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis.

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009) (quotations and citations omitted).

Ruiz's violation did not involve the employee purchase discount policy.  While Ruiz admittedly inflated the conversion rates by purchasing small items from Cracker Barrel without using her employee discount, there is no indication in the record that such conduct would have economically harmed Cracker Barrel to the extent Jones' conduct did.  Cracker Barrel erroneously paid Ruiz a bonus due to the inflated numbers, which she was required to pay back.

In contrast, Jones was allowing one or more retail sellers to purchase significant quantities of items at a deep discount of 35 or 45 percent.  This reduced Cracker Barrel's profit margin and conceivably permitted the resellers to offer the goods for sale to the public at a lower price than Cracker Barrel, thereby undercutting Cracker Barrel on its merchandise sales.  *See* Ruiz's Dep. [43-14] at 27 (testifying that DelGaicco extending her discount to Drago "raised a red flag to me because we weren't making our numbers.  So I'm like, well, maybe the fact that

she's reselling our products has an impact on why I'm not making my numbers.");
*see also* Ruiz's Dep. [37-6] at 35 (averring that she believed permitting the resale of
merchandise "does decrease the value of the brand and what we're trying to
accomplish as a company").

Moreover, the joint decisionmakers who terminated Jones were Rivera,
Quinn, and Vanek.  None of those individuals participated in the 2017 Loss
Prevention investigation into Ruiz.  *See* Quinn's Decl. [37-3] at 4; Vanek's Decl. [37-
5] at 3-4.  Nor did any of the three have any involvement in the decision to
discipline Ruiz after the investigation, as those decisions were made by Cracker
Barrel's corporate human relations leadership.  *See* Quinn's Decl. [37-3] at 4;
Vanek's Decl. [37-5] at 3-4.  Because Ruiz's circumstances were not nearly identical
to those that resulted in Jones' termination, the Court cannot say that Ruiz
constitutes a proper comparator.

Unlike Jones, DelGaicco worked on the restaurant side of the Cracker Barrel
Gulfport store, as a Restaurant Manager.  *See* Ruiz's Dep. [37-6] at 27.  It is
undisputed that each Cracker Barrel has a restaurant side and a retail side, and as
Retail Manager, Jones would have overseen the retail side of the Gulfport store and
reported directly to the Retail District Manager, Rivera.  *See* Jones' Dep. [37-1] at
19, 21-22.  DelGaicco would have reported to someone else, the Restaurant District
Manager.  *See id.* at 22-23.  The evidence of record is that DelGaicco was not aware
that Drago was going to resell the items she purchased with DelGaicco's employee
discount.  Finally, Jones has presented no competent summary judgment evidence

27

that DelGaicco was younger than Jones.  Instead, Jones simply states in her brief

that "[u]pon information and belief, DelGaccio is in her 20's."  Pl.'s Resp. [44] at 17.

This unsupported allegation does not constitute competent summary judgment

evidence.  Jones has not shown the existence of nearly identical circumstances

between herself and DelGaccio.

In sum, Jones has not identified a proper comparator.  All that remains are

Jones' own, unsubstantiated beliefs that the reasons given by Cracker Barrel were

pretextual because she was a tenured manager who was replaced by someone

younger.  Jones' own subjective belief that Cracker Barrel's decision was based upon

age is insufficient to create an inference of discriminatory intent.  *See Lawrence v.*

*Univ. of Texas Med. Branch at Galveston*, 163 F.3d 309, 313 (5th Cir. 1999).

Because Jones has not proffered sufficient evidence of discriminatory motive,

summary judgment should be granted in favor of Cracker Barrel on Plaintiff's

ADEA claim.

C.    Plaintiff's associational ADA claim

The ADA provides that

[n]o covered entity shall discriminate against a qualified individual on
the basis of disability in regard to job application procedures, the hiring,
advancement, or discharge of employees, employee compensation, job
training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  The statute defines the term "discriminate against a qualified

individual on the basis of disability" to include "excluding or otherwise denying

equal jobs or benefits to a qualified individual because of the known disability of an

individual with whom the qualified individual is known to have a relationship or

association."  42 U.S.C. § 12112(b)(4).

The Fifth Circuit has noted in an unpublished case that it has not yet explicitly recognized the existence of an associational disability discrimination claim.  *Grimes v. Wal-Mart Stores Tex., L.L.C.*, 505 F. App'x 376, 380 n.1 (5th Cir. 2013).  The Fifth Circuit has stated that, if such a claim does exist, a prima facie case would require a plaintiff to show:

> (1) her qualification for the job, (2) an adverse employment action, (3) the employer's knowledge of the employee's disabled relative, and (4) that the adverse employment action occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor in the employer's adverse action.

*Id.* at 380; *see also Spencer v. FEI, Inc.*, 725 F. App'x 263, 267 (5th Cir. 2018).

Cracker Barrel argues that Jones cannot establish the fourth element of a prima facie case on an associational ADA claim, if one exists.  *See* Def.'s Mem. [42] at 22.  In response, Jones relies upon the conversation she had with Rivera on a business trip in January 2016 pertaining to the expense of her husband's ongoing cancer treatment.  *See* Pl.'s Resp. [44] at 20-21.  Jones also argues that a reasonable inference that her husband's disability was the determining factor in her termination can be drawn from the purported happenstance of Rivera and Restaurant District Manager Eric Johnson being in the Gulfport store for audits at the same time on January 17, 2016, Rivera's supposition that Jones' discount usage for the limited period from January 1 to 17, 2016, was excessive, Rivera's contacting Bishop to conduct an investigation, and Vanek's comment in an e-mail that Bishop burning videos of Jones "should strengthen the case against her."  Pl.'s Resp. [44] at

22; *see also* E-mail [43-6] at 1.

While these events occurred in temporal proximity to the conversation that
Rivera had with Jones about her husband's cancer treatment, the Court cannot say
that these incidents, whether considered alone or in combination, raise a reasonable
inference that Jones' husband's disability was a determining factor in her
termination.  According to Jones, Rivera's initial reaction to learning of Jones'
husband's diagnosis was "sympathetic and supportive," and Jones did not recall any
issues or problems arising with respect to her schedule with Rivera.  Jones' Dep.
[37-1] at 49.

As for the January 2016 business trip, Jones acknowledged that she believed
that the conversation with Rivera "was just a conversation, wellness check."  *Id.* at
165.  There is no indication that the cost of Jones' husband's treatment impacted
Rivera in any way, and the competent summary judgment evidence demonstrates
that the subject of Jones' husband's cancer diagnosis or treatments was never
raised or considered in the discussions that led up to Jones' termination.  Rivera's
Dep. [37-2] at 209; Quinn's Decl. [37-3] at 4; Vanek's Decl. [37-5] at 3.  Nor was it a
subject that apparently factored into their decision to terminate Jones.  Rivera's
Dep. [37-2] at 209; Quinn's Decl. [37-3] at 4; Vanek's Decl. [37-5] at 3.

As for the timing of Rivera's and Johnson's audits, nothing suggests that the
timing was suspicious, or that this was anything other than a pure coincidence.
Jones has presented no competent summary judgment evidence to the contrary.

With respect to Rivera's determination that Jones' discount usage was

excessive, Rivera explained that she and Johnson found that 29 transactions over the period of January 1 to 17, 2016, combined with the dollar amount of the discounts taken each day, were excessive. *See* Rivera's Dep. [43-4] at 215. This led her to contact Bishop in Loss Prevention. *Id.* at 104-06. Jones has not presented competent summary judgment evidence tending to show that Rivera's testimony as to her belief of excessiveness was false. As for Vanek's comment in an e-mail that Bishop burning videos of Jones "should strengthen the case against [Jones]," E-mail [43-6] at 1, Jones has not demonstrated that this was anything more than a stray remark, and this comment on its own is insufficient to support an inference of discriminatory intent.

In sum, Jones has not presented sufficient competent summary judgment evidence from which a reasonable jury could conclude that her husband's disability was a determining factor in her termination. Jones has failed to make a prima facie showing of associational disability discrimination. Summary judgment in Cracker Barrel's favor is appropriate.

## III. CONCLUSION

Because Cracker Barrel has shown that there is no genuine dispute of material fact for resolution at trial and that it is entitled to judgment as a matter of law on Jones' claims, summary judgment should be granted, and this case will be dismissed. To the extent the Court has not specifically addressed any of the parties' arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant Cracker Barrel Old Country Store, Inc.'s Motion [36] for Summary Judgment is **GRANTED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff Belinda Jones' claims are **DISMISSED WITH PREJUDICE**.  A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 12th day of March, 2019.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE